DECISION AND JUDGMENT ENTRY
{¶ 1} Appellants, Thermotech, Inc., Mark Hemsath and Klaus Hemsath, appeal the grant of summary judgment to Fisk Alloy Wire, Inc. ("Fisk"), on their claims for, inter alia, breach of contract and fraud. Fisk initiated litigation by filing a complaint seeking the unpaid amounts of two promissory notes signed by Thermotech and individually guaranteed by the Hemsaths. The trial court found Thermotech and Klaus Hemsath liable for the first note, and all three appellants liable for the second note. Fisk has filed a cross assignment of error challenging the trial court's grant of summary judgment to Mark Hemsath, finding his liability for the first note discharged in bankruptcy. For the following reasons, the judgment of the trial court is affirmed in full.
 {¶ 2} In December 1997, Mark and Klaus Hemsath, owners of Thermotech Industries, Inc. ("Thermotech"), an Ohio corporation, entered into a written agreement with Eric Fisk, in his capacity as representative of Fisk Alloy Wire, Inc., a New Jersey corporation, to build a furnace. The agreement required Fisk to make an initial down payment of $62,100, two installments of $62,100, and a final payment of $20,700, for a total purchase price of $207,000.
 {¶ 3} In September 1998, after Fisk made the down payment and the first installment payment, totaling $124,200, Mark and Klaus informed Fisk that Thermotech was financially unable to complete the furnace. According to Mark's deposition testimony, Thermotech had spent Fisk's payments on operating funds while it completed a previous project. Fisk notified the Hemsaths that he intended to regain his payments for the misappropriation; however, upon the Hemsath's urgings, the parties met and attempted to resolve how best the furnace may still be completed. The result was another written agreement ("restated agreement"). It was signed November 2, 1998.
 {¶ 4} The trial court found that the restated agreement incorporated the original agreement. The restated agreement increased the purchase price of the furnace to $234,000, by stating, "The maximum price of the furnace F.O.B. Thermotech is now $234,000 of which $124,200 has already been received by Thermotech. This leaves a maximum balance payable of $110,000 against which Fisk will be credited for any payments it makes pursuant to purchase orders for materials, supplies, and labor."
 {¶ 5} The conditions in the restated agreement evidence Fisk's intention to reduce any risk of loss of future furnace payments. For instance, Thermotech was to complete purchase orders for materials, mark them "ship to Thermotech, bill to Fisk" and then forward the order to Fisk for authorized signature; no purchase order would be valid unless authorized by Fisk. The restated agreement also required Thermotech to tag all received materials as property of Fisk, with the order number; title to all materials was explicitly vested in Fisk.
 {¶ 6} At issue here is the condition that Fisk receive the Hemsath's personal guarantees that any advanced monies in excess of the maximum purchase price would be repaid. Fisk explained by affidavit that, due to Thermotech's previous actions, Fisk insisted on the personal guaranties before he would allow the Hemsaths to continue on the project. The alternative was to seek a return of his previous payments, and the Hemsaths were made aware of his intention to do so if they did not complete the project on his terms. The paragraph containing the condition states:
 {¶ 7} "Fisk Alloy Wire acknowledges that Thermotech may incur cost overruns in excess of the $110,000 remaining owing under the restated contract. Fisk agrees to advance such sums to or on the behalf of Thermotech. As a condition to advancing any amount, Thermotech will issue a promissory note for that amount (or revised promissory note inclusive of previous advances). The promissory note shall bear interest at a rate of 10% per annum and shall be due six (6) months after the completion and delivery to Fisk of the furnace. Each promissory note(s) shall be personally guaranteed by the principals of Thermotech."
 {¶ 8} Appellants assert that during the course of construction Fisk requested modifications and upgrades to the furnace, to increase its performance. Mark testified that during installation he spent a large amount of time on-site trouble-shooting the furnace. However, despite what appellants characterize as an expanded scope, Klaus testified, and the trial court found, that the parties still considered the restated agreement to be in force.
 {¶ 9} Fisk was ultimately required to spend approximately $290,000 to complete the furnace, $57,195.51 in excess of the agreed-upon maximum purchase price of $234,000. Mark and Klaus each submitted their own reports as exhibits, opining that the actual value of the furnace as installed was $400,000; no other evidence of the furnace's actual value was submitted. In accordance with the restated agreement, in order to cover the payments in excess of the maximum purchase price, Fisk drafted two separate promissory notes, along with two corresponding guarantees.
 {¶ 10} The first promissory note, for the amount of $26, 458.60, dated April 5, 1999, was signed by Mark Hemsath, in his capacity as vice-president of Thermotech, on behalf of Thermotech. A guarantee was executed in support of the promissory note, and was executed by both Mark and Klaus Hemsath on April 15, 1999, with no notation to distinguish their capacity from that of individuals.
 {¶ 11} At some point after the first note and guaranty were signed but before the second note and guaranty were signed, Mark Hemsath filed for personal bankruptcy.
 {¶ 12} The second promissory note, for the amount of $29,273.25, dated August 20, 1999, was signed by both Mark and Klaus Hemsath; however, unlike the first promissory note, no notation was made as to their signatory capacity. The note did state, however, that Thermotech was the promisor. The guarantee executed in support of this note stated that Thermotech was the guarantor, contrary to the terms of the restated agreement and inconsistent with the first note and guaranty. Fisk submitted by affidavit that this was a typographical error and that the parties intended the Hemsaths, as individuals, to be listed as the guarantors, in accordance with the restated agreement and the first guarantee. Both Mark and Klaus Hemsath signed the second guarantee. No notation was made as to the capacity in which they signed the second guarantee.[1]
 {¶ 13} Thermotech did make some payment towards the notes. However, Thermotech defaulted when it closed, leaving a balance on the notes of $37,966.51 plus interest of $6,222.63 through September 30, 2003. When Fisk demanded payment of Mark and Klaus Hemsath they denied personal responsibility.
 {¶ 14} Fisk filed a complaint seeking the unpaid balance of the notes, totaling $37,966.51 plus interest of $6,222.63 through September 30, 2003. Appellants filed a cross-complaint, seeking damages for, inter alia, breach of contract, fraud, and unjust enrichment. Appellants' claims rest on their assertions that the upgrades which Fisk requested and received created a new contract which should supercede the restated agreement, and that Fisk breached the new contract when it refused to pay Thermotech and the Hemsaths for the actual value of the furnace. Appellants sought the difference between the amount Fisk paid and the "actual value" of the furnace as damages, and Mark Hemsath sought additional damages for consulting work that he performed on site post-installation.
 {¶ 15} After some discovery, both parties moved for summary judgment. The trial court granted appellee's motion in part and denied it in part and denied appellants' motion in full. Appellee's motion was denied to the extent that it held the first note to have been discharged by Mark's bankruptcy. Thus, the trial court's decision rendered Thermotech liable on the notes; Klaus Hemsath personally liable for the first note as a guarantor; and both Mark and Klaus Hemsath personally liable as guarantors for the second note.
 {¶ 16} Appellants present 13 assignments of error for review:
 {¶ 17} "Assignment of Error No. 1: The trial court erred by failing to grant summary judgment in favor of appellant Mark Hemsath on all claims against him given his bankruptcy.
 {¶ 18} "Assignment of Error No. 2: The trial court erred upon its application of the summary judgment standard.
 {¶ 19} "Assignment of Error No. 3: The trial court erred when construed [sic] the facts most favorable to the movant.
 {¶ 20} "Assignment of Error No. 4: The trial court erred in granting summary judgment upon appellants' fraud counterclaim.
 {¶ 21} "Assignment of Error No. 5: The trial court erred in holding that negligent misrepresentation requires that a `professional' provide false information as an element.
 {¶ 22} "Assignment of Error No. 6: The trial court erred by granting summary judgment against appellants/defendants' counterclaim for negligent misrepresentation.
 {¶ 23} "Assignment of Error No. 7: The trial court erred by applying a `clear and definite' standard to appellants/defendants' breach of contract claim.
 {¶ 24} "Assignment of Error No. 8: The trial court erred by confusing the first, second, and third contractual periods.
 {¶ 25} "Assignment of Error No. 9: The trial court erred in failing to apply the statute of limitations defense.
 {¶ 26} "Assignment of Error No. 10: The trial court erred by granting summary judgment against the defendants' counterclaim for breach of contract.
 {¶ 27} "Assignment of Error No. 11: The trial court erred by finding consideration for the restated agreement, notes and guaranties.
 {¶ 28} "Assignment of Error No. 12: The trial court erred by granting summary judgment upon the defense of mutual mistake.
 {¶ 29} "Assignment of Error No. 13: The trial court erred by including Mark Hemsath's post contract consulting work as part of the restated agreement."
 {¶ 30} Appellee has cross-appealed, and sets forth one cross-assignment of error:
 {¶ 31} "The trial court erred in finding that the claim against Mark based upon the first guarantee was discharged."
 {¶ 32} The moving party bears the initial burden of informing the trial court of the basis for the motion and identifying those portions of the record that demonstrate the absence of a genuine issue of fact as to an essential element of one or more of the non-moving party's claims. Dresher v. Burt (1996),75 Ohio St.3d 280, 292. "[A] moving party does not discharge its initial burden under Civ.R. 56 simply by making a conclusory assertion that the nonmoving party has no evidence to prove its case. The assertion must be backed by some evidence of the type listed in Civ.R. 56(C) which affirmatively shows that the nonmoving party has no evidence to support that party's claims." Dresher, supra at 293.
 {¶ 33} Once this burden has been satisfied, the non-moving party has the burden, as set forth at Civ.R. 56(E), to offer specific facts showing a genuine issue for trial. Id at 292. Civ.R. 56(E) provides: "When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleadings, but his response, by affidavit or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him." See, also, Dresher, supra, at 293.
 {¶ 34} The trial court was obliged to consider whether appellee demonstrated that appellants could not establish their claims as a matter of law, all the while, construing the facts and the inferences therefrom in a light most favorable to the non-moving party. Upon review of a grant or denial of summary judgment, the appellate court employs the same standard. Engelv. Corrigan (1983), 12 Ohio App.3d 34, paragraph one of the syllabus. Thus, the appellate court is also required to resolve any doubt in favor of the nonmoving party and construe evidence against the moving party. Norris v. Ohio Std. Oil Co. (1982),70 Ohio St.2d 1, 2.
 {¶ 35} Appellants have not raised error with respect to the validity of the trial court's judgment finding that the promissory notes are valid and binding as to Thermotech, and they have not separately raised error with respect to the validity of the guarantees. Appellants' assignments only raise error with respect to their defenses to the notes and guarantees and with respect to their counterclaims.
 {¶ 36} In their eleventh assignment of error, appellants assert that no consideration supported the restated agreement, the promissory notes, or the guarantees. Appellants argue that no consideration exists because the Hemsaths did not receive any payment or personal gain from the amounts Fisk advanced, because the furnace was undervalued and all monies received paid for furnace materials and other labor charges.
 {¶ 37} It is axiomatic in contract law that courts are not required to inquire into the adequacy of the consideration; the existence of some benefit or detriment to the promisor or promise is sufficient. Ford v. Tandy Transp., Inc. (1993)86 Ohio App.3d 364, 384. In the restated agreement, the Hemsaths promised to complete the furnace and Fisk agreed to pay a higher maximum purchase price. As for the notes and guarantees, Fisk advanced sums to finish the furnace and the Hemsaths promised to repay. Mark Hemsath testified that he wanted the furnace to be completed because Thermotech was hoping to derive good will and future business from a job well done for Fisk. The exchange of these additional promises and the benefits that accrued to Fisk and appellants constituted consideration. From any reading of the uncontested facts, if the Hemsaths failed to personally receive any financial remuneration for their work, it flowed from their squandering the $124,000 advanced by Fisk. The restated agreement represents appellants' voluntary choice between the two alternatives appellants themselves created: either answer Fisk's demands for repayment of the misspent money or, in lieu of repayment, build a furnace for the remainder of the maximum purchase price.
 {¶ 38} Appellants contend that "no consideration can be found for Mark Hemsath signing the second guaranty after all his debts, including both promissory notes, were discharged in bankruptcy." Mark's bankruptcy filing is irrelevant to whether his promise to repay sums advanced by Fisk constitutes consideration for the notes. Moreover, Mark and Klaus were required to personally guarantee the promissory notes by the restated agreement, which was supported by consideration. See Medina Supply Co. v.Corrado (1996), 116 Ohio App.3d 847, where promise of supplier to extend future credit constituted consideration for the principal's promise to personally guarantee the company's repayment. Thus, appellants' eleventh assignment of error is not well-taken.
 {¶ 39} Next, appellants argue in their ninth assignment of error that Fisk's action to enforce the promissory notes should be barred by the limitations clause of the original agreement, which states, "Any action for the breach of contract arising from this proposal must commence within one year after discovery, but in no event longer than two years after Preliminary Acceptance, by the Purchaser." Appellants argue that, since the original agreement was incorporated into the restated agreement, and since execution of the promissory notes was a condition of the restated agreement, the limitations clause should apply to Fisk's action to recover sums due for the promissory notes.
 {¶ 40} It is axiomatic that a promissory note, even though its execution may be a condition of another contract, constitutes a separate enforceable contract. Metropolitan Life Ins. V.Triskett Illinois, Inc. (1994), 97 Ohio App.3d 228, 234; MidAmerican National Bank Trust Co. v. Comte/Rogers DevelopmentCorp. (Sept. 30, 1996), 6th Dist. No. L-95-329. The limitations clause, quoted supra, only applies to actions for breach of contract arising from "this" proposal — prior to the restated agreement, "this" could only refer to the original agreement for appellants to build a furnace for Fisk and for Fisk to pay for it. To the extent that the original agreement was incorporated into the restated agreement, "this" could very well refer either only to the original agreement or to the entire restated agreement. However, we need not solve the ambiguity presented by the referential term because the promissory notes constitute a separate contract, even though their creation was a condition of the contract. Fisk's action to enforce the promissory notes arises independently of the restated agreement, and it is not within the purview of the limitations clause. If, for example, Fisk's action arose from a breach in the execution of the promissory notes, a term of the restated agreement, the limitations clause may apply upon interpretation of the referential term. However, no interpretation is necessary; Fisk seeks to enforce the separate promise to pay contained in the promissory notes. The ninth assignment of error is, therefore, not well-taken.
 {¶ 41} Appellants' seventh, eighth, and tenth assignments of error challenge the trial court's rejection of their breach of contract claim. Appellants contend that, after the restated agreement was signed and during installation of the furnace, Fisk's requested upgrades created a new, oral contract which should govern instead of the restated contract. Alternatively, appellants argue that the restated agreement was later orally modified when Fisk requested the subsequent upgrades. Appellants allege the existence of the following subsequent oral terms: that Fisk would no longer be bound by the restated agreement's maximum purchase price; that Fisk would pay the actual value of the furnace it received (allegedly $400,000); and that appellants would be relieved of the restated agreement's condition of executing promissory notes and personal guarantees in exchange for Fisk's advances in excess of the maximum purchase price. Appellants have advanced no specific oral statements by Fisk or its representatives evidencing new terms created subsequent to the restated agreement, aside from modifications to the furnace's specifications.
 {¶ 42} The trial court held that by arguing that terms of a new, oral contract supercede the express terms of the restated agreement, appellants were arguing that a novation occurred. See, generally, Grant-Holub Co. v. Goodman (1926), 23 Ohio App. 540,545; Bolling v. Clevepak Corp. (1984) 20 Ohio App.3d 113, 125.
 {¶ 43} On appeal, appellants stated, "Kindly note that the appellants did not plead a novation but instead plead [sic] a breach of contract claim in the alternative to the unjust enrichment claim. * * * Whatever you call that, the `third period' of the relationship, if indeed it is considered a new contract, a quasi contract, or a novation * * *." In their eighth assignment of error, appellants argue that the restated agreement was "either replaced, modified, or amended when an order for a difference furnace was placed (the state of the art hydrogen burning furnace." In their tenth assignment of error, appellants state that, at the least, both parties dispute the nature of their contractual relationship, pointing to the purported "third period" of oral agreements in support.[2]
 {¶ 44} R.C. 1302.01 et seq. governs sales of goods in Ohio.[3] This furnace qualifies as a "good" pursuant to R.C. 1302.01(A)(8), because the appellants' depositions and documentary evidence shows that the furnace was constructed for Fisk at Thermotech's place of business and was to be delivered and installed; thus it was "movable at the time of identification to the contract for sale * * *." Id.; see, also Cain v. Clarkand Day, Inc. d.b.a. AB Cole Heating Air Conditioning (July 7, 1989), 11th Dist. No. 88-T-4140, treating an installed furnace as a "good" pursuant to Ohio's commercial code.
 {¶ 45} The commercial code requires contracts for the sale of goods over $500 to comply with the statute of frauds, R.C.1302.04(A), and it governs the original agreement and the restated agreement. Thus, as a matter of law, an oral contract for the sale of this furnace would be unenforceable if found to violate the statute of frauds. See, Knox Machinery, Inc. v.Doosan Machinery, USA, Inc., 12th Dist. No. CA2002-03-033, 2002-Ohio-5147, at ¶ 12. Appellee raised the statute as a defense in its answer to appellants' breach of contract claim, but failed to argue it on summary judgment; however, upon review, the original agreement and the restated agreement both meet the requirements of R.C. 1302.04.
 {¶ 46} Appellants urge us to consider unspecified oral statements as parol evidence. The commercial code contains a codified parol evidence rule, R.C. 1302.05: "Terms with respect to which the confirmatory memoranda of the parties agree or which are otherwise set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement but may be explained or supplemented:
 {¶ 47} "(A) by course of dealing or usage of trade as provided in section 1301.11 of the Revised Code or by a course of performance as provided in section 1302.11 of the Revised Code; and
 {¶ 48} "(B) by evidence of consistent additional terms unless the court finds the writing to have been intended also as a complete and exclusive statement of the terms of the agreement." R.C 1302.05.
 {¶ 49} The legislative notes to R.C. 1302.05 indicate that it is to be applied according to Ohio's common law parol evidence rule: "This section is in general accord with the parol evidence rules followed by the Ohio courts. It has been held that where the contract by its terms imports a complete legal obligation and there is no uncertainty, it will be conclusively assumed that the whole of the agreement has been reduced to writing; however, the surrounding circumstances may be introduced not to vary the intent of the parties but to explain ambiguities." (Citations omitted.)
 {¶ 50} Appellants attached a copy of the original agreement to their motion in opposition to summary judgment, which contains two pages headed "Terms and Conditions of Contract: Warranty." At the end of the section, in capital letters, it states the following:
 {¶ 51} "No express warranties and no implied warranties whether of merchantability or fitness for any particular use, or otherwise (except as to title), other than those expressly set forth above which are made expressly in lieu of all other warranties, shall apply to products sold by seller, and nowaiver, alteration, or modification of the foregoing conditionsshall be valid unless made in writing and signed by an executiveofficer of the seller.
 {¶ 52} "The seller's salesmen may have made oral statements about the merchandise described in this contract. Such statements do not constitute warranties, shall not be relied on by buyer, and are not part of the contract for sale. The entire contractis embodied in this writing. This writing constitutes the finalexpression of the parties' agreement, and it is a complete andexclusive statement of the terms of that agreement." (Emphasis added.)[4]
 {¶ 53} The Warranty's merger clause was honored when the parties executed the restated agreement, and was incorporated by reference. See discussion, supra. Now, appellants have made no mention of the merger clause during this litigation, have in fact attempted to hide it in their appellate brief, and, after having made payments toward the notes, and after Thermotech's default, argue that: 1) Fisk implicitly consented to paying a higher price when he asked for upgrades to the furnace, and 2) Fisk orally promised to relieve them of the liability of the promissory notes. At bottom, appellants ask that the written language of the original agreement and the restated agreement be ignored in favor of "quasi-contractual principles" or "equity."
 {¶ 54} The language of R.C. 1302.05 only acts as a bar to oral terms or promises made prior to or contemporaneously with the written agreement. Evidence of subsequent modifications, oral or written, is thus excepted from the parol evidence rule.Norris v. Royal Indemnity Co. (1984), 20 Ohio App.3d 206, 208;Kaufman v. Byers (2004), 159 Ohio App.3d 238, 247. The rule "has no application to evidence regarding a subsequent oral modification of a written agreement or to the waiver of contractual terms by language or conduct." Uebelacker v. CincomSystems, Inc. (1988) 48 Ohio App.3d 268, 273.
 {¶ 55} Thus, although courts must presume that the parties expressed their intentions in the language chosen for a written contract, Shifrin v. Forest City Ent., Inc. (1992),64 Ohio St.3d 635, "[s]ubsequent acts and agreements may modify the terms of a contract, and, unless otherwise specified, neither consideration nor a writing is necessary. A gratuitous oral agreement to modify a prior contract is binding if it is acted upon by the parties and if a refusal to enforce the modification would result in a fraud or injury to the promisee." Smaldino v.Larsick (1993) 90 Ohio App.3d 691, 698 (internal citations omitted).
 {¶ 56} Assuming for the sake of illustration that, during the course of the furnace's construction, Fisk did agree to pay costs incurred above and beyond the restated agreement's maximum purchase price, startling questions remain: Why did Thermotech sign the promissory notes for the overages, which were documented costs incurred through purchase orders for the furnace, and why did the Hemsaths agree to guaranty the notes? Assuming that the Hemsaths performed work on the furnace which expanded the scope of the restated agreement, why did they never demand payment from Fisk?
 {¶ 57} When asked these specific questions in deposition, Klaus testified that he did not want to sign the guarantees, but that he felt as if he had to. He felt that, although the restated agreement's condition was for the principles of Thermotech to guaranty the notes, his resignation as an officer on August 30, 1998, rendered him not liable. He acknowledged that he did continue to be a shareholder until Thermotech closed. He acknowledged his understanding that the restated agreement was made in consideration of the fact that Thermotech could not financially perform the original agreement, and that Fisk would have to provide it with financial assistance; he acknowledged sending a letter to Fisk enclosing the signed restated agreement on November 16, 1998; he admitted that he wanted to complete the project, and agreed to the terms in order to do it; he recounted making objections over the guaranties at the time; he did, however, admit to signing the restated agreement as a Thermotech principal.
 {¶ 58} Regarding the changes in scope during the furnace's construction, Klaus asserted that industry practice was to "push" the technological advancements further by modifying projects requirements mid-stream, and that purchasing agreements are written generally to accommodate the "constant influx and demand by the customer of making certain changes." He then explained, "unfortunately, those changes are, as a rule, not very well documented. The reason is that the vendor believes he can do a favor to the customer, keep him as a good customer, and the customer doesn't want to have it documented because I [sic] do not want to have after-the-fact demands for payment." He stated that the changes in the scope of the furnace's construction were not changes of the restated agreement, but that they were in addition to it. However, when asked whether the change in scope would not have justified a refusal to sign the promissory notes and the guaranties, he said that the changes to the furnace did not enter into his consideration, and he still felt obligated to comply with the terms of the restated purchasing agreement by signing the notes and guaranties.
 {¶ 59} Klaus did dispute his signatures and the validity of the guarantees in his deposition; however, we address the failure to properly raise this argument on appeal, infra. For the breach of contract issues, the above suffices to show that Klaus was not of the understanding that oral agreements subsequent to the restated agreement superceded or replaced the restated agreement's terms of a maximum price that Fisk would pay and the condition that promissory notes and guarantees be executed in repayment of excess costs. By signing the restated agreement, the parties' course of performance was consistent with the original agreement's merger clause; further, the execution of the promissory notes and the guarantees demonstrates a course of performance consistent with the understanding that the restated agreement continued to govern, despite the change in scope. If the change in scope was thought to have caused a modification of the maximum purchase price, the Hemsaths, to be consistent with the original agreement authored by Thermotech, would have insisted upon Fisk's written agreement to the change in price.
 {¶ 60} Mark also testified to his understanding that the restated agreement governed and that the "third period" of the furnace's construction and installation did not modify the restated agreement's terms of the maximum price or the condition that notes and guaranties be executed. Most significantly, in a letter dated September 30, 1998, a few days prior to executing the restated agreement but after Thermotech informed Fisk that it was financially unable to complete the furnace, Mark wrote Fisk as follows:
 {¶ 61} "In light that this furnace may become more expensive than the $110,000 previously discussed, I would like to offer that, should we require any additional funding, that Thermotech issue a Promissory Note in exchange for any extra dollars required. We fully intend to produce the furnace for the $110,000 but you and we need to be covered in the event of possible overruns. * * * Klaus and I will continue on unpaid for a couple of months to assist the cash flow picture. We look forward to your reply and finishing the furnace." By return letter dated October 23, 1998, Fisk wrote: "In sum, we want this rescue effort to succeed and we accept and appreciate your offer for the promissory note for any cost overruns above $110,000. We will draft that note in advance." On April 15, 1999, after receiving Fisk's detailed invoice showing amounts paid for materials in excess of $110,000, and the first note and guaranty, Mark wrote Fisk: "Enclosed are the signed note and guaranty. I have marked these up to reflect as I think they should be structured (A note from Thermotech and a guaranty by Klaus and myself). The liability is Thermotech's." Thus, Mark, and by extension, Thermotech, had full knowledge before the restated agreement as to the import and conditions of its terms, fully accepted those conditions during and subsequent to construction, and never raised the existence of oral modifications to the maximum purchase price or their liability for costs in excess of the price. In short, any supposed oral modification was not acted upon by the parties, and so is not considered as parol evidence to the contract. See Smaldino v. Larsick, supra.
 {¶ 62} Thus, assuming that Fisk's requested upgrades caused a modification of the terms, appellants subsequently acted in accordance with the restated agreement by not only signing the promissory notes on behalf of Thermotech, but also by executing the guarantees. In the final analysis, the Hemsaths' actions subsequent to the modifications made to the furnace reaffirmed the conditions in the restated agreement; their actions contradict the existence of oral agreements to increase the purchase price, to release Thermotech from repaying Fisk for costs in excess, or to release themselves from their promise of guaranteeing the notes. Appellants' seventh, eighth, and tenth assignments of error are therefore not well-taken.
 {¶ 63} In their twelfth assignment of error, appellants assert that the defense of mutual mistake regarding the restated agreement should have relieved them from liability. This assertion hinges upon appellants' breach of contract claims, discussed supra. Here, appellants argue that, because they were under the mistaken idea that the subsequent oral agreement governed, the restated agreement should be rescinded.
 {¶ 64} "[M]anifested mutual assent rather than actual mental assent is the essential element in the formation of contracts, that a mistaken idea of one or both parties in regard to the making of an offer and acceptance will not generally prevent the formation of a contract. 2 Lord, Williston on Contracts (4 Ed. 1991) 682-684, Section 6:57." Ford v. Tandy Transp., Inc.
(1993) 86 Ohio App.3d 364, 381.
 {¶ 65} The trial court held that the defense of mutual mistake must fail because appellants were unable to point to any mistake that was mutual, citing the restatement of contracts: "Relief is only appropriate in situations where a mistake ofboth parties has such a material effect on the agreed exchange of performances as to upset the very basis for the contract." See also, Reilly v. Richards (1994), 69 Ohio St.3d 352, 353. The trial court noted that Fisk has consistently contended that the restated agreement governed, and that subsequent to the furnace's construction and installation, appellants acted in conformity with that agreement. Appellants' attempt to characterize Fisk's belief that the restated agreement governed as a "mistaken" belief. This is not a mistake. Appellants' reiteration of their breach of contract arguments in this fashion is little more than contrived drivel. Appellants' twelfth assignment of error is not well-taken.
 {¶ 66} Appellants' fourth assignment of error asserts fraud by actually citing a case. However, their arguments are again premised on an oral contract or modifications which should govern instead of the restated agreement with which they acted in conformity. The only additional argument offered in support is a mischaracterization of Schmidt v. Bank of Commerce (1914),234 U.S. 64, 66-67, and a quotation lifted out of context in an attempt to prove that the Supreme Court holds that fraud should always be considered by a jury. Appellants point to two facts, which, they say, demonstrate genuine issues relating to fraud: 1) that Fisk received a $400,000 furnace for $234,000, and 2) the conclusory assertions that Fisk misrepresented the amount it paid in overages, despite the detailed purchase orders and accounts attached to the promissory notes sent to appellants for their signatures. Although appellants characterize the trial court's decision regarding their fraud claim as "attempts to sweep the fraud claim under the rug," that it precisely what one does with rubbish. Appellants' fourth assignment of error is not well-taken.
 {¶ 67} Dovetailing from the fraud claim, appellants assert that Fisk negligently misrepresented something — precisely what, is unclear. Appellants cite Delman v. City of Cleveland Heights
(1989), 41 Ohio St.3d 1, for the elements of negligent misrepresentation: "One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information." Id. at 4. Upon review, the trial court correctly determined that Fisk could not have misrepresented appellants' responsibility to execute promissory notes to cover costs paid in excess; Fisk's representation was consistent with the restated agreement. The trial court's statement of the law had no effect upon its correct conclusion, as "professional" is clearly a shorthand reference to the rule. Appellants' fifth and sixth assignments of error are not well-taken.
 {¶ 68} Appellants' thirteenth assignment concerns Mark Hemsath's counterclaim for $10,000 owed him for his on-site consulting services. Mark testified Fisk incurred this debt to him when 1) he performed several weeks of on-site work installing and troubleshooting the furnace, and 2) he performed more on-site consulting for Fisk in 2002, after Fisk contacted him for help with the furnace. He admitted that he had no documentation in support of his claim, and he admitted that he had never invoiced Fisk for any amounts it owed. The trial court found that unjust enrichment did not apply because "unjust enrichment is the theory for damages when an express contract does not exist, but the trial court finds a quasi-contract," citing Angles v. West, 4th Dist. No. 04CA8, 2005-Ohio-166.
 {¶ 69} "A claim for unjust enrichment arises out of a contract implied in law, or quasi-contract. Hummel v. Hummel
(1938), 133 Ohio St. 520, 525-528. Such a contract is not a true contract, but is an `obligation that is created by the law without regard to expressions of assent by either words or acts * * *.' (Citations omitted.) Legros v. Tarr (1989),44 Ohio St.3d 1, 7-8. Under this type of contract, civil liability `arises out of the obligation cast by law upon a person in receipt of benefits which he [or she] is not justly entitled to retain' without compensating the individual who conferred the benefits.Hummel, 133 Ohio St. at 525." Firstar Bank, N.A. v. PrestigeMotors, Inc., 6th Dist. No. H-04-037, 2005-Ohio-4432, at ¶ 8.
 {¶ 70} Mark Hemsath argues that the trial court should have included only the post-installation consulting work in the restated agreement, and that it failed to consider that his consulting work in 2002 was not part of that agreement, and so was not covered by a contract. Be that as it may, and notwithstanding Mark's assertion that Fisk produced no evidence to disprove his claim, Mark has not advanced evidence beyond his own assertions that he performed the work. As Dresher, supra, made clear, summary judgment does not require that the moving party support its motion with affirmative evidence disproving the non-moving party's claim. Fisk carried its summary judgment burden by demonstrating the absence of evidence in support of his claim,[5] and Mark has not carried his corresponding burden. The thirteenth assignment of error is not well-taken.
 {¶ 71} We jointly consider appellants' first assignment of error and appellee's cross assignment of error. The trial court correctly found that Mark's Chapter 7 no asset bankruptcy discharged his liability on the first guarantee. Appellee is correct in that, generally, unlisted debts are excepted from discharge pursuant to 11 U.S.C. 523(a)(3); however, in a no asset bankruptcy, debts incurred prior to discharge need not be listed in order to be discharged. Since Mark signed the first guarantee prior to his no asset bankruptcy filing, his individual liability on the first note is discharged. See In re Madaj (6th Cir., 1998), 149 F.3d 467; In re Humar (N.D. Ohio 1993),163 B.R. 296, 299. However, Mark signed the second guaranty of the second promissory note after his debts were discharged on April 20, 1999. Since a Chapter 7 discharge does not apply to post-discharge debts, see In re Smith (S.D. Ohio, 2000),249 B.R. 748, In re Thomas (N.D. Ohio 1991), 133 B.R. 92, 95, Mark is individually liable for the pro rata balance on the second note. The trial court's decision is affirmed; appellants' first assignment of error and appellee's cross-assignment of error are both not well taken.
 {¶ 72} Upon review, and for reasons detailed on the merits, supra, we find appellants' second and third assignments of error challenging the trial court's application of the summary judgment standard not well-taken. We decline to address appellants' sparse arguments relating to the notations and signatures upon the guarantees (devoid of citation to law) because of appellants' failure to comply with the appellate rules by arguing the issue separately in its brief. "The burden of affirmatively demonstrating error on appeal rests with the party asserting error. App.R. 9(B); App.R. 16(A)(7). App.R. 12(B) provides that an appellate court is required to determine the merits of an appeal on the assignments of error, which should designate thespecific rulings that an appellant challenges." Baker v.Tarsha, 6th Dist. No. L-04-1040, 2004-Ohio-6315, citing NorthCoast Cookies, Inc. v. Sweet Temptations, Inc. (1984)16 Ohio App.3d 342, 343 (emphasis added). We would add, for clarity's sake, that in addition to the trial court's decision that the Hemsaths are personally liable as guarantors, these guarantees were executed as absolute guarantees, and Fisk is not required to exhaust his remedies against Thermotech before seeking repayment from the Hemsaths. Accord, Campco Distributors, Inc. v. Fries
(1987), 42 Ohio App.3d 200, differentiating between conditional and absolute guarantees and stating the rule that, under nearly identical language, a creditor need not pursue and exhaust the principal before proceeding against the guarantor.
 {¶ 73} For the foregoing reasons, the judgment of the Lucas County Court of Common Pleas is affirmed. Appellants are ordered to pay the costs of this appeal pursuant to App.R. 24. Judgment for the clerk's expense incurred in preparation of the record, fees allowed by law, and the fee for filing the appeal is awarded to Lucas County.
JUDGMENT AFFIRMED.
A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. See, also, 6th Dist.Loc.App.R. 4, amended 1/1/98.
Pietrykowski, J., Skow, J., Parish, J., Concur.
[1] Both guaranties included a choice of law clause stating that it would be governed and construed in accordance with New Jersey law. Neither party raised or asserted this clause below, neither party objected to the trial court's application of Ohio law, and neither party raises this issue on appeal. Therefore, we find the choice of law clause waived and apply Ohio law. Contractual choice of law clauses are not an exception to the general rule that "[w]aiver is generally applicable to all personal rights and privileges, whether contractual, statutory, or constitutional." State ex rel. Stacy v. Batavia Local SchoolDist. Bd. of Edn. (2002) 97 Ohio St.3d 269, 273.
[2] In each of these assignments, appellants have cited not a single case or statute in support of their arguments. Appellate briefs must contain "citations to the authorities, statutes, and parts of the record" on which the party relies. App.R. 16(A)(7).
[3] Astonishingly, neither party brought the existence of the Uniform Commercial Code to anyone's attention. The trial court utilized the UCC in determining that the notes and guarantees were valid, but did not extend it to the agreements for sale. Since the appellate court stands in the shoes of the trial court and conducts an independent review of the record, we may affirm the grant of summary judgment on grounds other than those considered by the trial court. See Dresher, supra.
[4] The Warranty pages, as attached to appellants' motion in opposition to summary judgment, were Bates stamped 146-147. Attached to appellants' appellate brief and marked as Appendix B, is another copy of the original agreement. Interestingly, the pages are Bates stamped beginning 141, continue to 145, then resume 148. Pages 146 and 147, containing the Warranty, although they exist in the middle of the agreement, were somehow omitted from the version appellants' submitted on appeal.
Appellants have characterized Fisk's actions as "dirty pool." No further statement illustrating this hypocrisy should be necessary.
[5] If anything, the evidence shows that Mark performed the work in compensation for Thermotech's and his debt. In a letter dated September 2, 2002, Mark wrote Fisk: "I have given your generous offer very careful thought. Your offer was for me to agree to a half settlement of the Thermotech Industries, Inc. outstanding debt, which Klaus and I both guaranteed. * * * I propose the following: * * * Second, I propose that you let me work off the rest via time charges and parts shipments as required. All I ask is a few weeks notice. * * * After one year, we will revue [sic] what is left. Hopefully, I will have the means to clear up the difference at that time. I think this is the best offer I am able to make."