SPECTRUM NETWORKS, INC., Plaintiff,

v.

PLUS REALTY, Cincinnati, Inc., d.b.a. Re/Max Plus Realtors, Defendant.

2007-Ohio-6580.]

Court of Common Pleas of Ohio,
Clermont County.

No. 2005 CVH 00786.

Decided March 21, 2007.

70

Richard D. Schilling, for plaintiff.

Gary D. Ostendarp, for defendant.

RINGLAND, Judge.

{¶ 1} This matter came before the court for bench trial on January 29, 2007. Both parties presented evidence and testimony and later submitted their closing arguments in written form. Plaintiff, Spectrum Networks, Inc. ("Spectrum"), filed its closing argument with the court on February 12, 2007. Defendant Plus Realty, Cincinnati, Inc., doing business as Re/Max Plus Realtors ("Re/Max") filed its closing argument on February 26, 2007, with Spectrum's reply following on March 5, 2007. Having considered the evidence and testimony adduced at trial, the arguments of counsel, and the relevant legal authority, the court hereby decides the matter as follows:

### Factual Background

{¶ 2} Spectrum initiated contact with Re/Max in August 2004, when Spectrum employee Harry Samol placed a cold call to Re/Max office manager Bill Davis. During this call, Samol discussed Spectrum's telecommunications-consulting services. Samol followed this call by e-mailing Davis on August 25, 2004, to inform him that Spectrum had reviewed Re/Max's telephone account and could "definitely" save Re/Max money on its telecommunications expenses. At this time, Re/Max received its telephone service from Cincinnati Bell ("CBT") at a cost of $821.23 per month.

{¶ 3} Samol's e-mail requested that Davis sign Spectrum's Network Services Agreement so that the savings could be discussed further. Samol informed Davis that the agreement outlined Spectrum's fee structure, which was based on the amount of savings that would accrue to Re/Max. Davis signed the agreement that same day and returned it to Samol. On September 3, 2004, Samol e-mailed Davis with a proposal showing that Re/Max could obtain monthly savings of $162.16 over the three-year term of the agreement by switching its local lines to Cincinnati Bell's Centrex service. Savings over the three-year term of the agreement were quoted at $5,837.76.

{¶ 4} Some time in late September, Re/Max and Spectrum met to discuss this proposal in greater depth. During this meeting, Davis asked Samol and Spec-

trum principal Trent McCracken whether Spectrum had researched the telecommunications services provided by Nuvox Communications ("Nuvox"). According to Re/Max, McCracken questioned the continued financial viability of Nuvox and dismissed the possibility of Nuvox's providing services for Re/Max. According to Spectrum, Davis stated at this time that Re/Max intended to choose the Centrex service pending final authorization from its ownership. Later that month, Spectrum's wireless-service specialist met with Re/Max to discuss the "pooling" of Re/Max's cellular services for efficiency and cost savings. However, on September 29, 2004, Re/Max entered an agreement with a competing telecommunications consultant. This led to its ultimate decision to contract with Nuvox for its telecommunications services. Re/Max claims that Nuvox provided a comparably better product than the Centrex service for a much cheaper price, with no installation charge.

## Legal Analysis

{¶ 5} Spectrum complains that Re/Max provided neither notice that it intended to sign the Nuvox contract nor the payment required by the agreement. As a result, Spectrum filed the instant lawsuit for breach, seeking $15,000 in compensation pursuant to paragraph 5(b) of the agreement.

{¶ 6} The court first notes that paragraph 16 of the agreement contains a forum-selection clause requiring that "any suit relating to this Agreement shall be instituted in * * * *Hamilton County*, Ohio." Generally speaking, such forum-selection provisions are enforceable absent a strong showing that they should be set aside. See *Cent. Ohio Graphics, Inc. v. O'Brien Business Equip., Inc.* (Mar. 28, 1996), Franklin App. No. 95APE08–1016, 1996 WL 145480, at *2, citing *M/S Bremen v. Zapata Off–Shore Co.* (1972), 407 U.S. 1, 92 S.Ct. 1907, 32 L.Ed.2d 513. Nonetheless, Spectrum elected to file its suit in Clermont County. Because Re/Max voiced no objection, the court considers the forum-selection clause waived. "Waiver is generally applicable to all personal rights and privileges, whether contractual, statutory, or constitutional." *Fisk Alloy Wire, Inc. v. Hemsath*, Lucas App. No. L–05–1097, 2005-Ohio-7007, 2005 WL 3557392, at ¶ 12, fn. 1, citing *State ex rel. Stacy v. Batavia Local School Dist. Bd. of Edn.* (2002), 97 Ohio St.3d 269, 273, 779 N.E.2d 216.

{¶ 7} There is no dispute that Davis signed and returned the agreement on behalf of Re/Max, nor is there any disagreement regarding his authority to do so. Furthermore, he admittedly did not read this document before signing it. While he stated at trial that he never would have signed the agreement had he read and understood its terms, it is axiomatic that "a person of ordinary mind cannot be heard to say that he was misled into signing a paper which was different than what he intended, when he could have known the truth by merely looking when

he signed." *McAdams v. McAdams* (1909), 80 Ohio St. 232, 240–241, 88 N.E. 542. In its defense, Re/Max claims that Spectrum's failure to substantially perform its contractual obligations of (a) researching such providers as AT & T, Sprint, MCI, or Qwest, (b) researching Nuvox upon Re/Max's request, or (c) providing proposals for long-distance or Internet services do not entitle Spectrum to payment. However, the court first elects to discuss the enforceability of the agreement itself, particularly the provision governing Spectrum's claim for compensation.

## A. Enforceability of Paragraph 5(b) as a Liquidated Damages Clause

{¶ 8} Spectrum claims that its entitlement to payment stems from paragraph 5(b) of the agreement. The full text of this provision reads as follows:

> If Customer elects to 1) remain with its existing telecommunications provider(s) or 2) execute a new contract with Customer's existing telecommunication provider(s), or 3) execute a contract with a telecommunication provider(s) other than one within the Spectrum portfolio whereby Spectrum would receive no compensation related to services provided by that telecommunication provider(s), then Customer agrees that it shall directly compensate Spectrum *the greater of:* 1) 50% of the total contract Telecommunications Services Expense Savings (the product of Monthly Telecommunications Services Expense Savings and the number of months in each contract) the Customer obtains by remaining with Customer's existing telecommunication provider(s), executing a new contract with the Customer's existing telecommunication provider(s), or executing a new contract with another telecommunication provider(s) where Spectrum would receive no compensation from that telecommunication provider(s) or 2) $15,000. The provision of this Subsection 5(b) shall apply to all telecommunications services provided to Customer pursuant to each contract signed by Customer or proposed by Spectrum. One hundred percent (100%) of such fee shall be paid to Spectrum on the earlier of: 1) fifteen (15) days after the Customer has notified Spectrum of its intent to remain with its existing telecommunication provider(s), renews the service contract with the existing telecommunication provider(s), or executes a new contract with another telecommunication provider(s), or 2) thirty (30) days after Spectrum has presented its telecommunications proposal to Customer.

(Emphasis added.)

{¶ 9} While testifying at trial, McCracken admitted his uncertainty regarding the basis for the $15,000 figure included in paragraph 5(b). However, he noted that if a customer enters a contract with a third party under which Spectrum would receive no compensation, paragraph 5(b) permits Spectrum to cover certain losses arising from such a circumstance. The court views this

provision as a liquidated-damages clause because it is a prospective attempt to fix Spectrum's compensation for actual damages suffered in the event that Re/Max signed with a service provider who would not pay Spectrum directly.

{¶ 10} Ohio law recognizes contract clauses providing for reasonable liquidated damages as valid and enforceable. See, e.g., *Samson Sales, Inc. v. Honeywell, Inc.* (1984), 12 Ohio St.3d 27, 12 OBR 23, 465 N.E.2d 392. However, Ohio courts will *not* enforce a provision for so-called liquidated damages when it is actually in the nature of a penalty. *Schwartz v. Baker* (1950), 46 O.O. 488, 99 N.E.2d 498. The legitimate objective of such provisions is reasonable compensation for actual damages. Where the amount specified is manifestly inequitable and unrealistic, the courts will ordinarily regard the provision as a penalty. See *Samson Sales*, supra; *Cad Cam, Inc. v. Underwood* (1987), 36 Ohio App.3d 90, 521 N.E.2d 498.

{¶ 11} The amount contained in a liquidated-damages clause should be treated as liquidated damages and not as a penalty, if (1) damages are uncertain as to the amount and difficult to prove, (2) the contract as a whole is not so manifestly unconscionable, unreasonable, and disproportionate in amount as to justify the conclusion that it does not express the true intent of the parties, and (3) the contract is consistent with the conclusion that it was the intention of the parties that the damages in the amount stated should follow a breach thereof. 30 Ohio Jurisprudence 3d (1979) 135, Damages, Section 106.

### 1. Unconscionability of the Agreement

{¶ 12} Viewing the terms of the agreement in light of the circumstances surrounding its execution, the court finds it unconscionable. Unconscionability refers to the absence of a meaningful choice on the part of one of the parties to a contract, combined with contract terms that are unreasonably favorable to one party. *Collins v. Click Camera Video, Inc.* (1993), 86 Ohio App.3d 826, 834, 621 N.E.2d 1294. Accordingly, unconscionability consists of two separate concepts: (1) substantive unconscionability, which refers to the commercial reasonableness of the contract terms themselves, and (2) procedural unconscionability, which refers to the bargaining positions of the parties. Id. The question of unconscionability is one of law. *Featherstone v. Merrill Lynch, Pierce, Fenner Smith, Inc.*, 159 Ohio App.3d 27, 2004-Ohio-5953, 822 N.E.2d 841, at ¶ 12.

{¶ 13} Substantive unconscionability involves those factors relating to the terms of the individual contract and whether they are commercially reasonable. While no generally accepted list of factors exists for this category of unconscionability, courts examining substantive unconscionability have considered the fairness of the terms, the charge for the service rendered, the standard in the

industry, and the ability to accurately predict the extent of future liability. See *Small v. HCF of Perrysburg, Inc.* (2004), 159 Ohio App.3d 66, 2004-Ohio-5757, 823 N.E.2d 19, at ¶ 21. Procedural unconscionability, on the other hand, involves those factors bearing on the relative bargaining position of the contracting parties, including age, education, intelligence, business acumen, and experience, relative bargaining power, who drafted the contract, whether the terms were explained to the weaker party, whether alterations in the printed terms were possible, and whether there were alternative sources of supply for the goods. Id. at ¶ 22.

### a. Substantive Unconscionability

■ {¶ 14} The court finds paragraph 5(b) both long-winded and extremely confusing. When viewing the guaranteed amount of compensation owed to Spectrum in light of the limited performance required of it, the one-sided nature of the agreement becomes apparent. Paragraph 5(b) entitled Spectrum to payment of $15,000 even if it ultimately conferred no benefit whatsoever upon Re/Max. For example:

> Upon learning that Spectrum could save it no money on its telecommunications services and electing to remain with its then-current contract, paragraph 5(b) expressly required Re/Max to pay Spectrum $15,000;

> Upon learning that Spectrum could save it no money on its telecommunications services and signing a new contract for its then existing service as its best financial option, paragraph 5(b) expressly required Re/Max to pay Spectrum $15,000; and

> If Re/Max discovered that a provider outside the Spectrum portfolio provided the most savings, Spectrum would *still* expressly be entitled to $15,000 under paragraph 5(b).

{¶ 15} Furthermore, even assuming that Spectrum could provide financial savings to Re/Max, the agreement fails to address the possibility that a cheaper service within Spectrum's portfolio may not necessarily meet Re/Max's specific telecommunication needs. Spectrum would presumably still be entitled to collect $15,000 from Re/Max in such an event, despite failing to provide the assistance anticipated. In short, once Re/Max signed the agreement, Spectrum was practically guaranteed a minimum of $15,000, whether or not it ultimately helped Re/Max save money on its telecommunications services or provided Re/Max with a provider of comparable quality. The court deciphers the agreement as permitting Spectrum's recovery of a substantial sum of money, even when its services are not the best fit for the customer or are not ultimately used.[1]

---

1. It is also apparent to the court that the agreement bound Re/Max to pay $15,000 without truly binding Spectrum to anything of substance. Spectrum could conceivably obtain a

### b. Procedural Unconscionability

 {¶ 16} While the agreement's substantive unconscionability is apparent in a review of paragraph 5(b) in the abstract, Spectrum's claim for compensation is particularly problematic in light of the present facts. First, the evidence reveals that Spectrum informed Re/Max by telephone and e-mail that Spectrum could "definitely" save Re/Max money on its telecommunications expenses. However, for Re/Max to obtain specific information about these potential savings and make an informed decision about the future of its telecommunications services, it was first required to blindly enter into a contract drafted by Spectrum, which according to Davis was presented to him without any explanation and merely as a perfunctory "form." As the party holding the information, Spectrum therefore enjoyed the upper hand. It was practically guaranteed at least $15,000 upon return of the agreement regardless of the amount of the ultimate savings—if any—accruing to Re/Max.

{¶ 17} Second, paragraph 4 of the agreement characterized Re/Max's intent as to "*change* telecommunication provider(s) in order to receive savings on Monthly Telecommunications Services Expenses." (Emphasis added.) However, Spectrum's recommendation to Re/Max was ultimately CBT—Re/Max's *then current provider*. Because Spectrum represented to Re/Max that it had researched Re/Max's then current services as an inducement to enter the agreement, the court can only conclude that it possessed full knowledge that Re/Max's change to Centrex or another CBT service would result in payment being made pursuant to paragraph 5(b). This situation also effectively guaranteed Spectrum payment of at least $15,000, regardless of the actual value of the services it rendered.

 {¶ 18} Upon finding a contract or clause unconscionable at the time of its making, R.C. 1302.15(A) permits the court to refuse to enforce the contract as a whole, strike the unconscionable clause, or limit its application so as to avoid an unconscionable result. See R.C. 1302.15(A). However, paragraph 5(b) is the only compensation provision applicable to the present dispute in light of Re/Max's decision to contract with a provider outside of the Spectrum portfolio. The court can neither limit the application of this provision nor strike it entirely without stripping Spectrum of its right to payment under the agreement.[2] Accordingly,

---

signature, provide a mediocre proposal or none at all, and then stand back and collect $15,000, 15 or 30 days later, when its customer remained with its current provider or took it upon itself to find a better telecommunications deal on its own out of financial necessity.

2. Spectrum argues both that paragraph 16(d) of the agreement allows the court to substitute an enforceable provision in place of paragraph 5(b) and, alternatively, that the court may order payment pursuant to paragraph 5(a) and schedule B. The court declines the first invitation in light of the lack of evidence presented at trial regarding the actual amount of damages Spectrum suffered. The language of the agreement itself prevents the court from

the court has no choice but to refuse to enforce the agreement on unconscionability grounds.

{¶ 19} Not only does the court find the agreement both substantively and procedurally unconscionable, it also views paragraph 5(b) as impermissibly penal by its very language. In the event that Re/Max (or any other customer, for that matter) did not follow Spectrum's recommendation, it would be forced to pay Spectrum the *greater* of 50 percent of the savings it would have received before going elsewhere[3] or $15,000, a figure admittedly without any rational basis. As applied to Re/Max, this provision presents a manifestly inequitable and unrealistic calculation of Spectrum's actual damages that this court refuses to enforce.

## B. Spectrum's Substantial Performance of Its Contractual Obligations

{¶ 20} Notwithstanding the court's refusal to enforce the agreement on unconscionability grounds, Spectrum's recovery under the agreement must first be preceded by evidence of its own substantial performance. When the plaintiff is suing upon a contract and alleges performance that is denied by the defendant, it is incumbent upon the plaintiff to prove performance, at least substantially. *Ent. Roofing Sheet Metal Co. v. Howard Invest. Corp.* (1957), 105 Ohio App. 502, 503, 6 O.O.2d 232, 152 N.E.2d 807. Without proving that it substantially performed its duties under the agreement, Spectrum may recover nothing. See *Miller v. Bealer* (1992), 80 Ohio App.3d 180, 608 N.E.2d 1133. Paragraph 2(a) of the agreement required Spectrum to utilize its best efforts to:

Research, analyze, and recommend potential telecommunications providers for Customer. Spectrum shall provide telecommunications Consulting Services to the Customer as outlined in Schedule A * * *. Section (a) *shall include* (but not be limited to) the following list of telecommunications providers: AT & T, Sprint, MCI, Qwest, Broadwing, and/or any additional telecommunications provider(s) requested by Customer and offered by Spectrum.

(Emphasis added.)

{¶ 21} Schedule A, referenced in paragraph 2 of the agreement, required Spectrum to research the local and long-distance voice, Internet, and data industry in light of Re/Max's requirements and recommend services to Re/Max based on its findings. The plain text of paragraph 2 required Spectrum, at a minimum, to analyze the services provided by AT & T, Sprint, MCI, Qwest, and

---

applying paragraph 5(a) and schedule B to the facts of the case, as Re/Max did not contract with a provider within Spectrum's portfolio.

3. Spectrum estimated that this amount would be approximately $2,900 based upon the savings Re/Max would have received under the Centrex service proposal.

Broadwing. This provision also represented that each of these providers was offered by Spectrum.

{¶ 22} Re/Max correctly states that "for the doctrine of substantial performance to apply, the part unperformed must not destroy the value or purpose of the contract." *John P. Timmerman Co. v. Hare*, Allen App. No. 1–03–14, 2003-Ohio-4622, 2003 WL 22039329 at ¶ 13. To Re/Max, the purpose of its contractual relationship with Spectrum was to realize the "definite" savings Spectrum advertised by signing a telecommunications-service agreement with a new provider. The value was to be provided through Spectrum's research of the various providers listed in the agreement, granting Re/Max peace in the knowledge that the contract it ultimately signed was the best available. However, both parties agree that the only document ever actually given to Re/Max was the proposal for the Centrex service.

{¶ 23} At trial, Spectrum offered no documentary evidence that it had ever researched any provider aside from CBT, Re/Max's then current provider. In fact, McCracken could not definitively testify that Spectrum *ever* researched the other listed providers, stating only that Samol (whom Spectrum elected not to call as a witness) would have been responsible for conducting such research. In the court's view, Spectrum has failed in its responsibility to demonstrate substantial performance of its contractual duties to Re/Max. Therefore, it may not recover under the agreement.

### Conclusion

{¶ 24} In sum, the court views the agreement as unconscionable in its entirety and paragraph 5(b) as levying a penalty against Re/Max. Accordingly, the court refuses to enforce the agreement on these grounds. Additionally, the court holds that Spectrum's failure to evidence full or substantial performance of its obligations under paragraph 2(a) of the agreement also bars its recovery from Re/Max in this matter.

So ordered.